Thank you, Counsel. Our next case is Mario Arce. I think that's how you pronounce it. I'm not sure. Arce. Arce? Okay. Mario Arce v. Wexford Health Sources. All right. We'll hear first from Counsel for the appellant. Mr. Darrow? Darrow. Darrow. You may proceed. May it please the Court, Counsel. As I just mentioned, my name is Matt Darrow. It's an honor and a privilege for me to represent the appellant Mario Arce. I was appointed by the District Court for the Southern District of Illinois to represent him in this case where he fled constitutional violations under 42 U.S.C. 1983, specifically a deliberate indifference to his medical needs while he's an inmate at Pickneyville Correctional Center. We're here today appealing a summary judgment in favor of Dr. Budelid, Nurse Bloom, and Wexford Health Sources. The law is not unsettled in this area. It appears we largely agree with the District Court as well. The issue is the facts relating to Mario's care after a June 18, 2017 incident playing soccer in the rec yard where he was kneed in the thigh. Can I ask you this, Mr. Darrow? He seems very focused on this compartment syndrome possibility, and yet I am at a loss to find actually affirmative evidence in this record that would allow a reasonable jury to conclude that this is what he had. There's a different way of looking at this record, which is that even though he as a layperson keeps going to the doctor and complaining of maybe compartment syndrome, whatever, but he is pretty clearly complaining over a long period of time of substantial pain, and the prison medical people never get to the bottom of whatever that is. And so I'm wondering to what extent is your claim here just about the unredressed pain, and to what extent is it about follow-up for compartment syndrome or a tighter focus on that? It's a good question, Your Honor, and the claims are for both. He did plead that there were issues with a lack of attention to the pain that he continually suffered over an extended period of time without improvement. That is part of the issues that are on appeal and that were addressed in the summary judgment motion, and the judge should not have denied summary judgment on that. You're correct. Mario is very focused on the compartment syndrome. That's what he understood when he saw a specialist, an orthopedist at SLU Hospital. But the only thing the specialist says is, I'm going to test for this, come back in a couple of days. That, of course, doesn't happen. But it's my lay understanding of compartment syndrome that if that's really what had been going on, it would have shown up in all of these subsequent examinations, even by the prison doctors. So I don't see where the two or three days, or at least I don't see evidence in the record, showing that this two or three days somehow made a proper diagnosis impossible. I think there's evidence in the record, Your Honor, and the parties agreed that compartment syndrome can be evidenced by continued progression of swelling, changes in sensation, numbness at the top of the foot, and significant pain. But they weren't finding that. What they do find is the blood clot, which is serious enough as it is. You see people die of these things occasionally if they break loose, and they treat that. That was also identified as a fact that a blood clot can result from compartment syndrome as far as finding it. What the doctors found and what they didn't find and what they wrote down isn't always consistent with what Mario Arce's deposition testimony was, an affidavit that he filed earlier in this case, and that we submitted in opposition to the summary judgment, which was that he did have continued pain. He had increased swelling after he returned from the hospital. The pain is what he's very consistent about. That, of course, we actually have cases about people who say, if I'm in pain and you keep trying things and it's not working, then you're not doing enough. That is exactly true, and I agree with you there, Your Honor, that I think with respect to the pain and the lack thereof with the medications and the continued treatment without any improvement, that that alone should have defeated summary judgment on this and should survive. But does the continued treatment not address the question regarding deliberate indifference, that the doctors, the treatment plans that they were putting in place were attempting to find the source of the pain? No, Your Honor, there's no indication of that. There was a situation where there was no pain medication. Eventually, after he was released from the infirmary, he was given Motrin. He wasn't seen by either the nurse practitioner, Bloom, or Butylid for an extended period of time after he returned. Eventually, Bloom saw him after 10 days, Butylid much later than that, and at one point they gave him a stronger narcotic for just one week called Ultram that helped. Butylid testified that he prescribes it for a week because he wants to check you at the end to make sure you still need it and that it's working. He never came back and checked him, so that expired. So it was one week of relief. It did work. Ultimately, he had a situation where he had a neuropathic pain that was identified, but the physical therapist was telling them both that he needed something for this neuropathic pain back in the fall of 2017. He didn't get that until the spring of 2018. It was just three days. As far as the course of treatment, they weren't really doing anything to identify the issue other than when they were reacting when there were issues when he'd either have to go to the emergency room or he developed a situation with a blood clot where that was identified. They did give him thinners, I think, for the blood clot purposes. But as far as improving his leg, his mobility, there was a prescription for the physical therapist. That may have made sense at one juncture, but the physical therapist was telling them repeatedly that there was no improvement and something different needed to be done, and they just ignored it. I think the pain medication is Neurontin, is that right? Neurontin, yes. It seems like at least that there were prescriptions and orders for Neurontin, as you say, in early 2018 going to mid-2018. I guess I'm trying to assess the record. Putting aside, and it is relevant that Mr. Arce complained about the pain, is there anything in the record that would indicate that this course of treatment was somehow beyond the pale or not professionally recognized or that some other type of medication would have helped relieve the pain when Neurontin failed? Neurontin worked, but he only got it for three days. And starting in March 18, 2018, that was apparently because of a Wexford policy. It was outside of the formulary, so they stopped using it. Earlier, Ultram was the other one I identified that was a narcotic pain medication that worked, but he only got it for a week, and that was in July of 2017. The Neurontin, I think, is a neuropathic or a nerve pain medication, and that's an issue he started having and kept having, but he didn't get it until March 18, 2018. But no one ever links neuropathic pain to compartment syndrome. And even if we step back and say, well, he was just having pain anyway, he also gets the nortriptyline, which is another neuropathic, and I think the duloxetine is also neuropathic. Lots of these others are just painkillers, the Ultram, Trimadol, Tylenol, ibuprofen, and so on. The others were the ones they were, they weren't effective, and he continued to complain that they weren't effective. They give him a low bunk permit, right? I think originally they did, after he was released from the infirmary. If I can reserve a minute of my time, I'm going to answer other questions. I'll give you a minute and rebuttal. Thank you. All right. We will now hear from the appellees. Is it Cree? Cray, Your Honor. Cray. Mr. Cray. May it please the Court. Counsel. My name is Patrick Cray, representing Dr. Alberto Boutilid, MP Bob Blum, and Wexford Health Sources. The district court's order granting summary judgment in favor of these defendants should be affirmed. So, Mr. Cray, why doesn't this case, in your mind, fit within the types of cases that Judge Wood was referring to, where an inmate complains about severe pain and basically is given the same treatment over months, sometimes years, with the inference that it's completely ineffective? If Your Honors will entertain me to go a little bit through the factual record here to address that, I think that those facts are what differentiates this case from a lot of those cases. I'm kind of skipping over the compartment syndrome testing and the eventual diagnosis of DVT. It seems like the interest is more in the pain. So starting from there, at the first reassessment on June 28th, after he is seen for the first time after observation in the infirmary, Blum notes no signs and symptoms of distress, and he notes that the bruising is healing. And at this time, the R.C. is put on Motrin. And though Blum noted some pain at this reassessment, the pain is when he's performing the test for the Holman sign, which actually diagnoses that DVT. At this time, and in between the infirmary visit and this reassessment, R.C. does not make any complaints of pain or go to the health care unit to seek out pain medication. While Blum, after the fact, may have preferred narcotics or nerve pain medication or muscle relaxers at that time, he does not raise those issues in the moment. And in any event, the Eighth Amendment does not guarantee complete relief from pain or a choice of what pain relief is given. On July 7th is the next visit after the DVT is diagnosed. At this visit, Blum also notes that R.C. again shows no signs and symptoms of distress. He did not seek out any care from the health care unit in between June 28th and July 7th, and Dr. Boodle had testified during his deposition that such reports of pain and such visits to the health care unit informs the health care treaters whether or not their treatment plan is working and whether or not it needs any adjustment. When he's diagnosed with DVT and he's put on the anticoagulation on July 7th, he's kept in the infirmary for a five-day period. During that time, he doesn't complain about the pain medication he's receiving, which at the time is Motrin, and he's discharged on July 12th. His next scheduled health care visit after discharge from the infirmary is on July 14th, which he voluntarily skips out on, and he testified at the time he was able to ambulate fine on crutches. His next visit is on July 20th, where he sees Dr. Boodle again in the health care unit. And this is the first time that R.C. himself articulates to Dr. Boodle that he is experiencing a worsening pain. And accordingly, Dr. Boodle responds by elevating R.C.'s medications by ordering a narcotic, in this case Tramadol. R.C. does not complain to Dr. Boodle or Blum of any pain in between that visit on July 20th and October 27th, over three months later. At this visit, he complains to N.P. Blum about the pain, and at this time— So are those prescriptions carried forward? I understood Mr. Jauer to be saying that some of them were just a couple of days and then abandoned. I did not note in the record where those citations come from that the prescriptions were not filled. In any event, there is no indication in the record that Blum or Boodle themselves were made aware of those prescriptions not being filled. And in addition to that, because R.C. is not coming to the health care unit complaining about pain, as far as Dr. Boodle and N.P. Blum go, they have no subjective knowledge, which is the standard under deliberate indifference, that this inmate is suffering from pain that's not being adequately treated. And then after Blum is made aware of that next visit on October 27th about increased pain, that's when he prescribes— In the timeline, though, do we recognize the August 4th grievance? On August 4th. That was a collegial review, correct? It's the grievance for the persistent pain. For the grievance of the pain, as far as I'm aware, it's not imputed knowledge to Dr. Boodle or N.P. Blum that they are made aware of R.C. that is still in pain. And this is Dr. Boodle's deposition testimony. If R.C. goes to the health care unit and seeks out pain, they're either made aware of that treatment not being given or they, as they do in several instances in the record here, actually elevate the level of pain medication given because they actually see him. And then after that August 4th visit, October 27th visit, which I described where nortriptyline is prescribed, and then after that on November 27th, that's one month later, R.C. goes to Pinckneyville Hospital for an ER visit due to a concern of a blood clot, and he then returns to Pinckneyville Correctional after. Now the discharge instructions from Pinckneyville Hospital only recommended ibuprofen and an anti-inflammatory naproxen. Blum, on November 27th, again goes above and beyond the discharge instructions by increasing the amount of nortriptyline, which is already prescribed to R.C. Now there's a span from that November 27th, 2017 date through March 11th, 2018, where he again does not voice a concern and there's no record evidence of a concern being voiced to Dr. Boodle or Blum about persistent pain. But on March 11th, 2018, R.C. sees Dr. Budelid where he first complains that the nortriptyline that he's been receiving is not helping. He's not saying he didn't receive it, that the prescription's not given to him, that it's not helping him. And at this visit, Dr. Budelid changed the prescription to the Neurontin, which your Honor referenced previously. Five days later on March 16th, R.C. complains to Blum of continued pain, and at this visit, Blum prescribes the narcotic Tramadol. A couple weeks later on April 5th, and this is the last date I'll give you, a couple weeks later he complains to Dr. Budelid about persistent pain. At this time, there's an ultrasound which diagnoses the post-thrombotic syndrome, the buildup of the long-term deep vein thrombosis, and Dr. Budelid prescribes Tramadol or continues the Tramadol prescription to treat the post-thrombotic syndrome. So even your account suggests a pretty consistent story of pain, actually. Consistent story of pain. I think that that goes hand-in-hand with the underlying condition that R.C. had here, which is a deep vein thrombosis. And the medical evidence in the record shows that this is a condition that has wavering levels of pain, numbness, swollen parts of the body. And I think that that highlights the need for R.C. to have, in this case, verifying medical evidence which shows that his pain was caused by the inconsistent and unwavering symptoms of the deep vein thrombosis and not any delay in care or any lack of care. And on that issue, I want to use my remaining time to discuss what R.C. argued in his reply brief regarding his need for verifying medical evidence, specifically his need for expert medical testimony. And he argues that the medical record evidence in his deposition testimony in this case alone is enough to satisfy that standard. And he cites, in support of that contention, cases like Williams v. Leifer, Berry v. Peterman, and Grieveson v. Anderson. And those are cases where inmate plaintiffs are withheld from receiving any treatment. And there's medical record evidence showing that once they are given the treatment that they have been requesting, their symptoms immediately subside. And this Court has noted in those cases that a jury is permitted to find that once that treatment or medication is given to the patient, there's no need for further verifying medical evidence to show. But this is a factually distinct case because the deep vein thrombosis, the inconsistent reports of pain, the varying levels of pain in response to the medications being given, there needs to be some expert testimony or some other form of verifying medical evidence beyond just the medical records to permit a jury to find that there's some conduct from Dr. Butelid or M.P. Blum that is the cause of the pain or exacerbation of symptoms and not the deep vein thrombosis itself. We might need to spend some time talking through the Monell claim. Sure, of course. So on the Monell claim, the three prongs of the claim that we argue that R.C. doesn't meet any of them, the first being underlying constitutional deprivation for all the reasons explained, that there's no constitutional deprivation as a result of the conduct of Blum or Dr. Butelid, we find that he has not made that showing. As it relates to the three different kinds of actions linking deprivation to a corporate conduct of Wexford, there's no express policy that is shown to be a cause of injury. He argues that an attempt to cut costs is the reason why he didn't receive treatment he desired. But the Eighth Amendment doesn't permit an inmate to choose the treatment he wants, and through the timeline of medical care that I described, the complaints of pain as well as other symptoms and the physical therapy visits, those are all parts of the medical provider's decision-making process, and it wasn't a cost-cutting measure that decided why certain treatment decisions were made. Regarding a widespread practice, he provides absolutely zero evidence of any other inmates and how Wexford's policies were responsible for any injuries that they would have suffered. They're only exclusive to his claims here, which is not sufficient under Monell. As far as a final policy-making authority, this case is similar to the Whitting case, which I mentioned in my brief, which eventually states that Dr. Butelid is a decision-maker in the sense that he is on the collegial review, but that does not provide evidence that he's a final policy-maker. So that is not satisfied as well. And the final prong of showing that there's no Wexford moving force, for similar reasons, there's no evidence that Wexford's cost-saving policies or any other policy or practice was the cause of the exacerbation of any of the symptoms. Thank you. Thank you. We'll give a minute for rebuttal. Thank you, Your Honor. Counsel provided a detailed history, popping through a lot of the notes in sort of a timeline fashion. Part of my problem with why we're here today is, and you mentioned during the police case, the summary judgment standard that's involved. Mario was supposed to, the evidence was supposed to be construed in his favor with all reasonable inferences in his favor. Here, if you look through the briefs, there are very different stories that comes out and emanates when you read through the appellate briefs, if you read through the summary judgment papers, and that's because there are disputed issues of fact here. And those should have been dispositive such that, not that the court would grant summary judgment, but would reject that motion for summary judgment. For example, I think he mentioned several times where Bloom notes in the medical records, he's improving or he's better, whereas Arce testified that he was telling them he was in extreme pain, he was not better, that it had swelled from his groin to his ankle or to his calves, and that it was worsening. So there are disputed facts here. You can't just cherry pick the ones out that are favorable to their cause. They should have been determinative of this case, and that's why we asked to reverse and remain. Thank you. And Mr. Arrow, I wanted to thank you for your service to the Southern District of Illinois as well as this court. Thank you.